**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KATHERINE MACKEY,<br><br>Plaintiff,<br><br>v.<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH INC., BANK OF AMERICA CORP.<br><br>Defendants. | Case No. 26-cv-9503<br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT

Plaintiff Katherine Mackey, by and through her attorneys, Stowell & Friedman, Ltd., hereby files this Complaint against Defendants Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch" or "the Firm"), Bank of America Corporation ("Bank of America") (together, "Defendants").

## JURISDICTION

1. This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the Plaintiff is a citizen of Virginia, Defendants are citizens of New York, Delaware, and North Carolina, and more than $75,000 is in controversy.

2. Jurisdiction also lies under 28 U.S.C. § 1331 because the underlying dispute about whose arbitrability the Plaintiff seeks a declaration arise under federal law, namely Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act.

3. Venue is proper in this District under 28 U.S.C. § 1391(b). Merrill Lynch is headquartered in this District, and transact substantial business in this District, and are subject to personal jurisdiction here with respect to this action and is therefore deemed to reside here under

28 U.S.C. § 1391(c)(2). Additionally, a substantial part of the events or omissions giving rise to the claim, because Bank of America and Merrill Lynch authored, issued, and distributed the Arbitration Policy challenged in this suit in this District.

## PARTIES

4. Defendant Merrill Lynch, is a full-service securities firm and broker-dealer, incorporated in Delaware and headquartered in New York. Merrill Lynch is engaged in the retail and institutional sale of securities, options contracts, and various other financial products. Merrill Lynch is the wholly owned subsidiary of Bank of America.

5. Defendant Bank of America is a financial services company incorporated in Delaware with its principal place of business in North Carolina that provides a variety of banking and investment services. Bank of America acquired Merrill Lynch in or around 2009.

6. Plaintiff Katherine Mackey is a citizen of Virginia and was employed at Merrill Lynch as a Financial Solutions Advisor in Reston, Virginia until her unlawful termination in 2025.

## FACTUAL BACKGROUND

### Merrill Lynch's Legacy of Discrimination

7. As early as 1973, the Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against Merrill Lynch to vindicate the rights of women and minorities at the Firm. *See O'Bannon v. Merrill Lynch*, No. 73-cv-0905 (W.D. Pa.). To resolve the EEOC lawsuit, Merrill Lynch entered into a Consent Decree agreeing, among other things, to increase the Firm's representation of women and African American and Hispanic financial advisors ("FAs") and managers. For over 20 years, the EEOC and the Firm extended the Consent Decree when the Firm repeatedly and blatantly failed to meet the Consent Decree's goals and timetables.

Ultimately, in 1995, the EEOC gave up and accepted Merrill Lynch's representation that it would adopt a voluntary affirmative action plan to remedy ongoing and past discrimination. Significantly, while Merrill Lynch agreed in the 1970s that a goal of 6.5 percent representation of African American FAs was fair and attainable in the Consent Decree, 50 years later the Firm's African American FA population has remained essentially unchanged at approximately 2 percent.

8. Rather than reform, the Firm continued to perpetuate its white male culture, denying equal pay and advancement opportunities for women and minorities. In 1996, a group of female FAs sued the firm Merrill Lynch for discrimination. *See Cremin v. Merrill Lynch*, No. 96-cv-3773 (N.D. Ill.). Among other things, the *Cremin* lawsuit challenged the Firm's management assessment and selection practices as well as its discriminatory distribution of assets, resources, and other income-generating opportunities for female FAs.

9. Merrill Lynch's discrimination was so extensive that every arbitration panel to hear the statistical evidence concluded that the Firm had engaged in a pattern or practice of sex discrimination driven by its exclusionary culture. For example, in *Sumner v. Merrill Lynch*, an arbitration panel awarded $2.2 million to a *Cremin* Plaintiff, finding that Merrill Lynch engaged in a practice of sex discrimination in its compensation and management assessment policies. Specifically, the panel found that: "[T]he record clearly supports Sumner's allegations of class-wide discrimination against female [financial consultants] with respect to promotions to management positions. Dr. Goldman's statistical analysis shows gross disparities between male and females in management positions . . . ."

10. The court-approved settlement of the *Cremin* lawsuit included reforms and dispute resolution mechanisms designed to stop Merrill Lynch from discriminating not only

against women but also against African Americans. The Firm also paid out approximately $250,000,000 to its female FAs in settlement of claims.

11. Despite the Firm's numerous court-ordered commitments to improve opportunities and to increase African American and female representation, the Firm's entrenched white male culture refused to reform. In 2005, a group of African American financial advisors sued the Firm for race discrimination for systematically denying African Americans equal opportunities to earn income and advance to management. *See McReynolds v. Merrill Lynch*, No. 05-cv-6583 (N.D. Ill.). The *McReynolds* lawsuit brought to light Merrill Lynch's discriminatory practices regarding its management assessment program and its distribution of assets, resources, and other income-generating opportunities for African American FAs. *See also Morrison v. Merrill Lynch*, No. 08-cv-1150 (N.D. Ill.) (*McReynolds* class member filing a separate lawsuit because the Firm was engaged in a policy and practice of race discrimination by denying African Americans the opportunity to advance to branch management); *Reynolds v. Merrill Lynch*, No. 11-cv-4313 (N.D. Ill.) (same).

12. Publicly filed documents, Merrill Lynch internal studies, and reports to senior executives confirmed the Firm's entrenched cultural biases and racially divided workforce. Expert analysis of Merrill Lynch's workforce and client data revealed stark racial disparities, from training to FAs to management. First, Merrill Lynch was 34% more likely to terminate African American trainees than white trainees. If African Americans did complete the program, Merrill Lynch paid them 33% to 42% less than their white peers. And from 2001–2006, only five of the over 120 candidates for management were African American. Of those, only one was approved for management.

13. Respected University of Illinois-Chicago sociologist William Bielby, PhD, found

that "[t]he criteria for qualifying for the [Management Assessment Center] is one that by design screens out African Americans." He found that "the isolation and exclusion from social networks that tends to occur in work contexts where African Americans have only token presence can make it more difficult to get the management sponsorship required to qualify for the [Management Assessment Center]."

14. Ultimately, after the Seventh Circuit Court of Appeals ordered the District Court to certify a class of Black FAs, Merrill Lynch agreed to settle the *McReynolds* suit for a historic $160 million in 2013. More than 50 years after the EEOC first sought to hold Merrill Lynch accountable, African Americans remain underrepresented in Merrill Lynch's employee population, including in management, earn substantially less than their white counterparts, and continue to suffer from discrimination and retaliation as a result of Merrill Lynch's discriminatory culture, practices, and policies.

15. Merrill Lynch's unbridled discrimination and dismal diversity numbers have not occurred in a vacuum. Instead, they result directly and intentionally from its exclusionary culture that favors white men and views African Americans as inferior, in accordance with harmful race-based stereotypes. These stereotypes are embedded in Firm policies and practices regarding employees, clients, and potential clients. The Firm's culture pervades personnel and business decisions and creates a hostile work environment where occupational segregation and disparate treatment are condoned and perpetuated.

16. This culture starts at the top and trickles down, permeating the Firm from management to FAs. During the *McReynolds* litigation, former CEO Stan O'Neal explained at a leadership meeting that one of Merrill Lynch's "hallmarks" was its "strong culture," which was "predominately white male oriented." O'Neal also noted that "[t]he majority is white male – so

that's what has been perpetuated." At a private client managers' meeting, a Merrill Lynch board member noted that part of Merrill Lynch's "heritage" was "exclusionary" and that it was "still a business more white and more male…."

17. This culture affects the management level, beginning with who is promoted. Candidates for management are weighed against the archetype of the traditional white male businessman. One assessor wrote that a white candidate was "another example of a real ML'er. He is Irish Catholic from Long Island, the oldest of six children." In contrast to these white men, Merrill Lynch told two African-born employees who successfully completed management training that they could never be effective managers because of their Nigerian and Ghanian accents. Management assessors noted that one African American woman was too "inflexible" and "confrontational." She did not pass management training.

18. At the FA level, and consistent with its exclusionary culture, Merrill Lynch treats its African American employees as fundamentally different from and inferior to their white peers. For example, a Merrill Lynch presentation to management acknowledged that African American FAs were excluded from teams because of negative assumptions about their competence. Another presentation suggested that managers encourage African American FAs to "learn to play golf or other activities designed to learn how 'business gets done' in manners the AAFA might not be familiar with." An HR report proposed that the Firm develop "training modules on culture, such as Country Club etiquette," for African American FAs.

19. Even the Firm's attempts to make inroads in diversity are infected by its racist culture. For example, as a strategy to reach African American clients, it broke the African American public into segments, including (1) the "entertainer/athlete" who has "money to burn" and is a "big spender," (2) the "assimilator" who doesn't "view color as a barrier" and is a

"successful individual first" and an "African American second," (3) and the "community leader/activist" who "doesn't trust the system" and thinks "Cash is King." As mainstream culture grows less tolerant of overt racism, the Firm has tried to keep up through diversity initiatives and events. However, rather than creating real change, the Firm treated its exclusionary culture as a problem for its African American employees to fix, asking them to lead "Courageous Conversations" and burdening them with unpaid and draining work that it did not ask of its white employees. In short, Merrill Lynch's deeply entrenched exclusionary culture allows discrimination to fester while corroding any attempt to diversify its workforce. Just recently, in 2025, Merrill Lynch entered a settlement agreement for $19.95 million with a class of Black FAs alleging company-wide racial discrimination regarding their compensation and promotion opportunities. *See Lucinda Council v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 3:24-CV-534-WWB-LLL, 2025 LX 180613 (M.D. Fla. Feb. 7, 2025).

20. More than 50 years after the EEOC placed Merrill Lynch on notice of systemic disparate treatment, Black employees remain drastically underrepresented and continue to earn substantially less than their white counterparts while regularly enduring discrimination in the workplace.

**Rather than Eliminate the Systemic Discrimination Bank of America Issued a Policy Mandating That All Bank of America and Merrill Lynch Employees Forgo Their Rights to Bring Lawsuits Seeking Redress For Discrimination in Court or Through Class Actions**

21. Instead of working to rid the workplace of discrimination which has cost the Firm hundreds of millions of dollars in lawsuit settlements, Merrill Lynch has chosen to rid itself of lawsuits challenging the discrimination.

22. An essential victory of the *McReynolds* settlement was Merrill Lynch's promise that it would "not require arbitration of any employment discrimination claims, except as

individually negotiated."

23. This provision not only preserved employees' right to access the courthouse, but it was the backbone of continued, good-faith negotiation between the Leadership Council and Merrill Lynch management.

24. Defendants destroyed that framework for negotiations without notice or negotiation with affected employees. On November 8, 2024, Bank of America distributed a mandatory arbitration and class action waiver policy to certain employees of Bank of America and Merrill Lynch. The Policy provided that simply by remaining employed for 30 days, all employees would be deemed to accept the policy.

25. Thirty days is insufficient time to secure alternative employment. In reality, the "choice" to either submit to mandatory arbitration or lose one's employment with no real prospect of finding new employment with insufficient notice was no choice at all.

26. The arbitration policy forced upon Bank of America and Merrill Lynch employees like Mackey purports to require employees to "FOREVER WAIVE AND GIVE UP THE RIGHT TO HAVE A COURT OR A JURY DECIDE ANY COVERED CLAIMS," including, conspicuously, claims for "discrimination and/or harassment."

27. The policy also precludes Bank of America and Merrill Lynch employees from organizing and filing a collective action to obtain a consent decree through litigation. Bank of America and Merrill Lynch employees are now required to bring claims "in arbitration in an individual capacity only" and such arbitration "must be adjudicated on an individual basis, and may not be initiated or maintained on a class action, collective action, or non-individual representative action basis in court or arbitration."

28. Even more troubling, the mandatory predispute Arbitration Policy selects JAMS

as the arbitral body to review claims of discrimination and retaliation.

29. JAMS is a multi-million dollar mediation and arbitration corporation.[1]

30. JAMS is privately owned primarily by many of its mediators and neutrals,[2] who have a direct financial incentive to appease repeat players like Defendants (and the law firms that represent them) that unilaterally selects JAMS to hear its employment matters.

31. Unlike federal court where decisionmakers must recuse themselves if they have a financial stake in the outcome, many JAMS arbitrators are or aspire to become equity partners with an interest in promoting arbitration and rewarding respondents for their repeat business.

32. The financial incentive paid to arbitrators destroys any appearance of impartiality or neutrality. *Cf. Tumey v. State of Ohio*, 273 U.S. 510 (1927) ("[O]fficers acting in a judicial or quasi-judicial capacity are disqualified by their [pecuniary] interest in [a] controversy.")

33. First, many of the JAMS arbitrators hold an equity interest in JAMS (though the precise number is not publicly available). Thus, when large employers such as Defendants select JAMS to mediate and arbitrate claims, its "neutrals" profit from the engagement.

34. Second, JAMS arbitrators earn $10,000 per day, if not more, for arbitrating or mediating disputes. Given the potential for future work, there is a financial disincentive for arbitrators to rule in favor of claimants or to award substantial damages, as doing so would surely result in large companies and repeat players such as Defendants striking the arbitrator from future panels, or moving business to another arbitral forum.

35. JAMS Arbitrators are not randomly selected. Instead, JAMS presents a list of 5 potential arbitrators to the parties, who may then strike, for any reason, two arbitrators, and the

---

[1] Matthew Rushton, *JAMS' International Jigsaw Puzzle*, 7 IN-HOUSE PERSP. 19 (2011) (estimating JAMS revenues at $120 million in 2011).

[2] *Id.* (noting JAMS was owned by an investment bank for a period, but is now owned and operated by its neutrals and arbitrators).

rules do not provide for the disclosure of which arbitrator(s) employers chose to strike or how it ranked the remaining arbitrators. This deprives employees of their Constitutional rights, such as *Batson* challenges when a respondent strikes arbitrators due to their race.[3]

36. The rules governing the selection of arbitrators merely provide the parties with a "brief description of the background and experience of each Arbitrator candidate." Employees are not entitled to review past opinions and awards issued by the panel of potential arbitrators in order to make an informed selection. Because JAMS proceedings are private, employees are unable to obtain this information from a publicly available source. But as "repeat players," Bank of America and Merrill Lynch are intimately familiar with JAMS's employment law arbitrators and their tendencies, and thus has an unfair informational advantage in selecting arbitrators.

37. Moreover, JAMS arbitrators are not required to make disclosures regarding potential conflict (including JAMS ownership or past business done with the Defendants) until *after* their appointment.[4] Thus, a claimant who believes an appointed arbitrator has a conflict is presented with the unsavory choice between letting the conflict stand or challenging the arbitrator after appointment, knowing that if the challenge is denied the case will be heard by an arbitrator who knows they were subject to a motion to strike for cause. *See, e.g.*, *Martin v. NTT Data, Inc.*, No. 20-CV-0686, 2020 WL 3429423, at *8 (E.D. Pa. June 23, 2020) (finding that, due to conflict of interest, JAMS arbitrator "would have been disqualified and her actions subject to ethical review" as a judge, but refusing to vacate arbitration order because plaintiff did not move to strike the arbitrator during JAMS proceeding).

38. Additionally, forced arbitration procedures at JAMS do not require basic due

---

[3] *See Carter v. Iconix Brand Group, Inc.*, No. 655894/2018 (N.Y. Sup. Ct., Nov. 28, 2018) (challenging AAA neutral panel of over 200 that had only 3 African American members).
[4] Rule 15(h), JAMS Employment Arbitration Rules & Procedure, at 7, *available at* https://jamsadr.widen.net/s/6k8ps78qvc/jams_employment_arbitration_rules-2021

process safeguards for civil rights Plaintiffs, who lack access to simple discovery.[6] JAMS similarly lacks the compulsory oversight of the financial industry that FINRA commands. Discovery disputes, like the cases themselves, will be resolved by an arbitrator, who as part-owner of JAMS, has a vested interest in large employers continuing to force employment discrimination disputes into arbitration at JAMS—business worth substantial revenue annually.[7]

39. At a minimum, these factors fairly leave the Plaintiff and those like her with a lack of confidence in the process and create an appearance of impropriety.

40. This is especially so in circumstances like Plaintiff's where mandatory predispute arbitration was foist upon her as a condition of her continued employment. Unlike post-dispute arbitrations where parties may select JAMS at arms length based on the needs and circumstances of their dispute, mandatory predispute arbitration forces employees like Plaintiff to bring civil rights claims with no meaningful choice in the matter.

41. As the Supreme Court explained, the rules of arbitration "rest on the premise that any tribunal permitted by law to try cases and controversies not only must be unbiased but also *must avoid even the appearance of bias*." *Commonwealth Coatings Corp.*, 393 U.S. at 150 (emphasis added). Thus, the Supreme Court went on to explain, "[w]e cannot believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another." *Id.*

42. Here, by selecting JAMS in a mandatory predispute arbitration policy as a forum for Plaintiff's civil rights claims, Defendants attempt to require Plaintiff to do just that.

**Mackey Has Live Civil Rights Claims that the Arbitration Policy Purports to Require Her to Arbitrate in JAMS**

43. Katherine Mackey was a Financial Advisor for Merrill Lynch in Virginia when she took a step back to care for her ailing mother.

44. In 2023, at age 65, she joined the Merrill Financial Services Advisor program for aspiring FAs.

45. But because of her gender and age, she was subjected to an escalating campaign of discrimination and harassment by younger, male colleagues and supervisors, including, among other things, denial of support and resources and micromanagement.

46. Discriminatorily starved of leads, Mackey fell behind her production goals and was given a Summer 2025 deadline to meet a production target.

47. Yet in January 2025, while she was on the precipice of closing business that would have led her to meet her target, the deadline was retroactively shortened.

48. Merrill Lynch terminated her employment effective February 2025.

49. Mackey's career has been devastated, and she has suffered substantial losses.

50. On November 7, 2025, Mackey filed a charge of discrimination with the EEOC alleging that the conduct alleged above in this Complaint constituted unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act.

51. On July 31, 2026, Mackey received a notice of right to sue from the EEOC.

52. Mackey therefore has live civil rights claims under federal antidiscrimination statutes that Defendants' Arbitration Policy purports to mandate her to arbitrate at JAMS.

53. Because Mackey has a time-limited notice of right to sue, in an abundance of caution, Mackey has filed those statutory claims in JAMS to preserve them, but intends to ask

JAMS to stay consideration of those claims until this Court rules on the validity and enforceability of the Arbitration Policy by this Court.

## COUNT I

## DECLARATORY JUDGMENT

## (Against Bank of America and Merrill Lynch)

54. Plaintiff realleges Paragraphs 1-53 above and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

55. For the reasons above, the Arbitration Policy is not a valid and enforceable contract.

56. For the reasons described above, Plaintiff has been harmed and is in imminent risk of harm because the invalid and unenforceable Arbitration Policy would purportedly require Plaintiff to arbitrate her civil rights claims in JAMS, which would prevent her from effectively vindicating her rights under federal antidiscrimination statutes.

57. Plaintiff is entitled to a declaration that the Arbitration Policy is invalid and unenforceable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the entry of judgment in her favor and against Defendants as follows:

a. Declare that the Arbitration Policy described above is invalid and unenforceable and that claims she has filed in JAMS may be re-filed in court;

b. Award Plaintiff attorneys fees, costs, and disbursements; and

c. Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: October 29, 2026

Respectfully Submitted,

*/s/ Jennifer S. Gilbert*
*Attorney for the Plaintiff*

Linda D. Friedman (*pro hac vice forthcoming*)
Jennifer S. Gilbert
STOWELL & FRIEDMAN, LTD.
303 W. Madison
Suite 2600
Chicago, Illinois 60606
(312) 431-0888
lfriedman@sfltd.com
jgilbert@sfltd.com